### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SARA LYNN KAZIMER,

      *Plaintiff*,

v.

COMMISSIONER OF
SOCIAL SECURITY,

      *Defendant*.

_____/

Case Nos. 2:22-cv-11268

District Judge Sean F. Cox
Magistrate Judge Patricia T. Morris

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 16)

### I.    RECOMMENDATION

Plaintiff challenges the Commissioner of Social Security regarding a final decision denying her claim for Supplemental Security Income ("SSI") under the Social Security Act. The case was referred to the undersigned for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I recommend **DENYING** Plaintiff's motion for summary judgment (ECF No. 13) and **GRANTING** the Commissioner's motion (ECF No. 16).

1

## II.   <u>REPORT</u>

### A. Introduction and Procedural History

On October 11, 2019, Plaintiff applied for SSI, alleging disability as of January 1, 2005.[1] (ECF No. 10-2, PageID.66).   Her application for benefits claims disability due to fibromyalgia, chronic pain, post-traumatic stress disorder ("PTSD"), neurocardiogenic syncope, dysautonomia, anxiety, bipolar disorder, borderline personality disorder, agoraphobia, attention deficit hyperactivity disorder ("ADHD"), migraines, and scoliosis.  (ECF No. 10-6, PageID.353).

Following the initial denial of the claim, Plaintiff requested a hearing, held by telephone February 11, 2021 before Administrative Law Judge ("ALJ") ALJ Earl Ashford.  (ECF No 8-2, PageID.89), (ECF No. 10-4, PageID.242).  On March 3, 2021, ALJ Ashford determined that Plaintiff was not disabled.  (ECF No 8-2, PageID.66-83).  On April 4, 2022, the Appeals Council denied review of the ALJ's determination.  (*Id*. at PageID.47-49).   Plaintiff filed the present action on June 8, 2022.

### B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The District Court's review is

---

[1] Plaintiff later amended the alleged onset of disability date to October 15, 2018.  (ECF No. 10-2, PageID.93).

restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means - and means only - 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not

4

disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

**D. The ALJ's Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since October 11, 2019, the date that Plaintiff

5

applied for SSI.   (ECF No. 8-2, PageID.69).   At Step Two, the ALJ found the

following impairments severe:

> depressive/bipolar disorders; history of Neurocardiogenic syncope;
> generalized anxiety disorder; panic disorder, with agoraphobia;
> migraines without aura, not intractable, without status migrainosus;
> dorsalgia /scoliosis /osteoarthritis of lumbar spine chronic back pain;
> asthma /history of bronchitis /acute maxillary sinusitis; [PTSD];
> borderline personality disorder /rule out dependent personality disorder
> /cluster B traits; [ADHD]; obesity; dysrhythmias; and bilateral knee pain
> of unknown etiology.

(*Id*.)  He found that the following medical conditions were non-severe because "they

had been responsive to treatment, cause no more than minimal vocationally relevant

limitations, and have not lasted or are not expected to result in more than minimal

work-related restriction for a continuous period of at least 12 months": 

fibromyalgia/chronic pain syndrome (considered pursuant to SSR 12-2p and SSR

14-1p); dysautonomia orthostatic hypotension syndrome; GERD/chronic reflux

esophagitis; history of kidney stones; visual impairment; furuncle; irritable bowel

syndrome; insomnia; chronic fatigue syndrome; vitamin D deficiency; history of

gallbladder surgery; history of opioid dependence in remission; and history of

polysubstance dependence.  (*Id*. at PageID.70).  He noted that while he found these

conditions non-severe, he accounted for them in the Residual Functional Capacity

("RFC").  (*Id*.)  He found that none of the impairments, considered independently

and in combination, met or medically equaled a listed impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1.

The ALJ found that Plaintiff experienced mild limitation in understanding, remembering, or applying information and moderate limitation in interacting with others; concentration, persistence, or pace; and adapting or managing herself. (*Id.* at PageID.72). Citing the medical transcript, the ALJ found that Plaintiff had the RFC for exertionally light work[2] with the following additional limitations:

> Postural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional stooping, kneeling, crouching and crawling. Occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few if any workplace changes. Occasional interaction with the general public, coworkers, and supervisors.

(*Id.* at PageID.73).[3]

---

[2] Under 20 C.F.R. §§ 404.1567(a-e), 416.967(a-e) *sedentary* work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and exertionally *heavy* work as "involv[ing] lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.

[3] The ALJ also noted that Plaintiff previously filed for benefits in June 2015 which were denied in October 2016 (ECF No. 10-2, PageID.66). He stated that the previous decision

was binding unless there was new and material evidence submitted relevant to a finding or there had been a change in the law (*Id*. at PageID.67). He concluded that newer evidence supported a change in the assessment of the non-severe impairments. He also found that the step three finding was not binding due to a change in the law. (*Id*.) The ALJ nonetheless found that no new evidence supported a change in the residual functional capacity finding (*Id*.) The ALJ's finding that he was bound by the findings from the earlier application absent new and material evidence or a change in law misstates the applicable standard for reviewing material from a newer period. In *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018), the ALJ believed that he was precluded from revisiting an earlier finding that the claimant was not disabled. "But this belief was incorrect. Rather, the Sixth Circuit explained, '[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory condition.'" *Balknight v. Comm'r of Soc. Sec.*, No. 18-11843, 2019 WL 4011881, at *13 (E.D. Mich. July 31, 2019), *report and recommendation adopted,* No. 18-CV-11843, 2019 WL 3997146 (E.D. Mich. Aug. 23, 2019) (citing *Earley* at 932). "As such, *res judicata* does not 'prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings.'" *Id.* (citing *Earley* at 931).

Notwithstanding, it is undisputed that the ALJ gave the evidence from October 2018 forward a "fresh look," albeit based on changes in the law and the non-severe impairments. The ALJ's findings also contain an exhaustive discussion of the records post-dating the earlier decision. Where courts give the new evidence a fresh look, the ALJ's decision satisfies *Earley*; "if not, then remand is appropriate." *Balknight,* at *14. *See also Snyder v. Comm'r of Soc. Sec.*, No. 1:17-cv-486, 2018 WL 4658813, at *3 (W.D. Mich. 2018) (finding that the ALJ's decision satisfied *Earley* by "effectively re-open[ing]" the prior ALJ's decision); *Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at *3 (W.D. Mich. 2018) (reversing where the ALJ did not satisfactorily review the evidence, but rather focused on the prior RFC findings); *Cassaday v. Comm'r of Soc. Sec.*, No. 1:17-cv-630, 2018 WL 4519989, at *3 (W.D. Mich. 2018) (reversing where the ALJ's decision was not consistent with *Earley*'s requirement of independent review); *Brent v. Comm'r of Soc. Sec.*, Case No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. 2018) (holding that pre-*Earley* ALJ sufficiently conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kamphaus v. Comm'r of Soc. Sec.*, No. 2:17-cv-11828, 2018 WL 3800243, at *5 (E.D. Mich. 2018) ("It is clear to the Undersigned that [the ALJ] did not simply apply *res judicata* principles and adopt [the previous ALJ's]findings 'lock, stock and barrel,' but instead gave new consideration and analysis" to the new evidence.), *Rep. & Rec. adopted by* 2018 WL 3770045 (E.D. Mich. 2018).

At Step Four, the ALJ found that Plaintiff had no past relevant work.  (*Id*. at PageID.81).  At Step Five, the ALJ cited the VE's testimony in support of his determination that Plaintiff could perform a significant number of jobs in the national economy, including the exertionally light, unskilled work of a merchandise marker, cleaner/housekeeper, and cafeteria attendant (*Id*. PageID.82, 111). Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id*. at PageID.83).

### E. Administrative Record

#### 1. The Medical Evidence

October 2019 records by psychiatrist Chad Saperstein note Plaintiff's report of depression, anxiety, and frustration with flashbacks to traumatic events.  (ECF No. 10-7, PageID.723).  December 2019 records note that Plaintiff's mother's recent emergency surgery required Plaintiff to assume some household responsibilities causing anxiety.  (*Id*. at PageID.722).

In January 2020, Dyan Hampton-Aytch, Ph.D. performed a non-examining review of the treating records, concluding that Plaintiff experienced mild limitation in the ability to understand, remember, or apply information and in adaptation but moderate limitation in interacting with others and concentration, persistence, or pace. (ECF No. 10-3, PageID.203).  The same month, Sonia Ramirez-Jacobs, M.D. performed a non-examining review of the records pertaining to Plaintiff's physical

condition, concluding that Plaintiff did not experience any significant work-related impairments.  (*Id*. at PageID.202).

February 2020 treating records by Robert Steckmeyer, N.P. note Plaintiff's report of continuing fibromyalgia pain.  (ECF No. 10-8, PageID.1310).  A self-evaluation of depressive symptoms ("PHQ-9") reflected severe depression.  (*Id*. at PageID.1309).  March 2020 records by Dr. Saperstein note that Plaintiff was worried about both her mother's health and her own condition of kidney stones.  (ECF No. 10-7, PageID.721).  June 2020 records note a current GAF of 58.[4]  (*Id*. at PageID.719).  July 2020 records note that Plaintiff was contemplating a five-day trip with friends.  (ECF No. 10-8, PageID.1360).  Dr. Saperstein's records from the following month note that Plaintiff felt that she made progress by taking a week-long vacation with friends.  (*Id*. at PageID.1359).

In August 2020, psychiatrist L. Imasa performed a consultative examination, noting Plaintiff's report that she was diagnosed with bipolar disorder but was more prone to depression.  (ECF No. 10-7, PageID.736).  Her symptoms included crying spells, sleep disturbances, weight fluctuation, and suicidal ideation.  (*Id*.).  She also

---

[4]GAF scores reflect a clinician's judgment about the individual's generalized level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  A GAF of 51 to 60 GAF scores reflects  moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

reported diagnoses of agoraphobia and ADHD. (*Id.*) She reported mental and physical abuse by family members. (*Id.*). She reported that she took care of her dogs, fish, and tree frogs. (*Id.* at PageID.737). Dr. Imasa noted that Plaintiff was in touch with reality, denied hallucinations, and exhibited a normal memory. (*Id.* at PageID.737). He noted "a history of psychiatric hospitalizations" and current psychiatric treatment. He gave her a guarded prognosis and opined that she was not able to handle her benefit funds. (*Id.* at PageID.738). The same month, Tanvir Qureshi, M.D. performed a one-time physical examination, finding no functional limitations. (*Id.* at PageID.752-754).

Later in October 2020, William Norton, Ph.D. concurred with Dr. Hampton-Aytch's January 2020 finding of mild limitation in the ability to understand, remember, or apply information and in adaptation but moderate limitation in interacting with others and concentration, persistence, or pace. (ECF No. 10-3, PageID.219, 224). The same month, Robin Mika, D.O. concurred with Dr. Ramirez-Jacobs' finding that Plaintiff's physical conditions were non-severe. (*Id.* at PageID.218).

December 2020 physical therapy records note mild to moderate right-sided thoracic scoliosis. (ECF No. 10-8, PageID.1342). The evaluation found no mobility-related impairment. (*Id.*).

In January 2021, Dr. Saperstein completed a Mental Residual Functional Capacity Questionnaire, finding Plaintiff had a current GAF of 52 because of bipolar disorder, avoidant personality disorder, physical problems, and family stressors. (*Id*. at PageID.1348). He found that Plaintiff was either unable to meet competitive standards required for fulltime work or had "no useful ability to function" in all aspects of psychological functioning. (*Id*. at PageID.1350-51). However, he also found that she could manage her own benefit funds. (*Id.* at PageID.1351). He found that she could be expected to miss more than four days of work each month. (*Id*.).

### 2. Plaintiff's Testimony

Plaintiff offered the following testimony: She was born August 16, 1991. (ECF No. 10-2, PageID.93). She lived with her mother. (*Id*.) She stood 5' 4" and weighed 245 pounds. (*Id*. at PageID.94). She had never had a driver's license. (*Id*.) She graduated from high school. (*Id*.) She was unable to work due to migraines, "issues with emotional stability," and severe pain of the lower back, hips, and legs. (*Id*.)

Plaintiff was unable to walk more than one block or stand for more than 15 minutes. (*Id*.) Standing for longer periods caused hip and leg pain and weakness. (*Id*. at PageID.95). She experienced hand problems due to fibromyalgia on an intermittent basis. (*Id*.) None of her treating sources had prescribed lifting restrictions but she limited herself to lifting 10 pounds. (*Id*.) She was unable to sit

for more than 15 minutes without shifting positions.  (*Id*.)

Plaintiff smoked between a quarter and half pack of cigarettes each day.  (*Id*. at PageID.96).  She last took opioid pain medication in November 2019 due to kidney stones.  (*Id*.)  She used alcohol and marijuana two months before the hearing.  (*Id*.)  She had never participated in a substance abuse program.  (*Id*. at PageID.97).  She was unable to sleep more than four hours a night but took daytime naps twice a week.  (*Id*.)  She did not require help showering but her mother remained nearby during her showers.  (*Id*. at PageID.97-98).  She needed help washing her hair and shaving her legs.  (*Id*. at PageID.98).  She was unable to perform any household chores due to "low energy" and poor motivation.  (*Id*. at PageID.98-99).  Plaintiff used to like art and listening to music but had lost interest in those pursuits in the past few years.  (*Id*. at PageID.99).  She was unable to leave her house to attend church or social events.  (*Id*.)

Plaintiff experienced migraine headaches at least twice a week lasting from four to eight hours.  (*Id*. at PageID.101).  She coped with the headaches by staying in a darkened room and sleeping.  (*Id*.)  She took Paxil, Chlorpromazine, and Naproxen for the headaches.  (*Id*.)  She saw a neurologist for the headaches while in high school.  (*Id*. at PageID.102).  She currently saw a cardiologist for syncope and dysautonomia.  (*Id*. at PageID.102-103).  She had not experienced syncope in the past two years.  (*Id*. at PageID.103).  She currently experienced the cardiac-related

symptoms of lightheadedness; tunnel and blurred vision; and daily heart palpations occurring several times a day. (*Id*.)  The lightheadedness required her to stand up slowly.  (*Id*.)

In response to questioning by her representative, Plaintiff reiterated that she experienced daily back and hip pain.  (*Id*. at PageID.106).  The pain occasionally traveled to her shoulders.  (*Id*.)  As to her mental health, she currently saw a counselor, psychiatrist, and case manager.  (*Id*.)  The symptoms of depression included lack of energy, irritability, sleep disturbances, and suicidal ideation. (*Id*. at PageID.107).  She spent most of her waking hours in a reclining chair.  (*Id*.)  During her mother's 2019 hospitalization, Plaintiff was required to care for their dogs and pick up the mail.  (*Id*. at PageID.108).  For that period, her grandmother helped her with household chores and her sister shopped for groceries.  (*Id*. at PageID.108-109).

### 3.  The Vocational Expert's Testimony

Vocational Expert ("VE") Rebecca Kendrick testified that Plaintiff had no work history.  (*Id*. at PageID.109).

The ALJ then posed the following set of modifiers to the VE, describing a hypothetical individual of Plaintiff's age, education, and (lack of) work history:

> [L]ight exertional level, postural limitation of no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, occasional stooping, kneeling, crouching, and crawling; occasional use of the bilateral lower extremities for operation of foot controls; manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering.  Environmental limitation to avoid all exposure

14

> to hazards, such as dangerous moving machinery and unprotected heights; additional environmental limitation to avoid concentrated exposure to irritants, such as fumes, odors, dust, and gases. Work limited to simple, routine and repetitive tasks and a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts involving only work-related decisions with few, if any, workplace changes, occasional interaction with the general public, co-workers, and supervisors.

(*Id*. at PageID.110). The VE testified that the above limitation would allow for the unskilled, light work of a merchandise marker, Dictionary of Occupational Titles ("DOT") code 209.587-034 (approximately 129,000 positions in the national economy); cleaner/housekeeper, DOT code 323.687-014 (221,000); and cafeteria attendant, DOT code 311.677-010 (29,000). (*Id*. at PageID.111).

The VE testified further that if the above set of modifiers was amended to include a "sit/stand" option allowing the individual to change positions every half hour, the job numbers would remain unchanged. (*Id*.) The VE testified if the modifiers were further amended with a limitation to sedentary work, the individual could perform the jobs of an inspector, DOT code 726.684-110 (9,000); address clerk, DOT code 209.587-010, s (8,000); and sorter, DOT code 521.687-086 (9,000). (*Id*. at PageID.112). She stated that the need to take two additional 15-minute breaks each workday; miss more than two days of work each month; or be off task more than 20 percent of the workday would preclude all competitive employment. (*Id*. at PageID.113).

The VE stated that her testimony was based on the information found in the

DOT and its companion publications, except for her testimony as to the sit/stand option, time off task, absenteeism, interaction with others, pacing, or foot controls which was based on her "experience and training as a vocational counselor." (*Id*. at PageID.114).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)   A licensed or certified psychologist at the independent practice level; or

    (ii)  A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. §§ 404.1502(a), 416.902(a). (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* §§ 404.1502(d), 416.902(a). In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* §§ 404.1502(e), 416.902. "This includes, but is not limited to: (1) [the claimant]; (2) Educational

17

personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* §§ 404.1520c(a), 416.920(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative

medical finding(s) is with the evidence from other medical sources and nonmedical

sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be[.]" *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*

§§ 404.1520c(c)(3), 416.920c(c)(3). This factor will include the analysis of:

    (i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this

determination, the SSA will consider "[t]he medical opinion or prior administrative

medical finding of a medical source who has received advanced education and

training to become a specialist may be more persuasive about medical issues related

to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* §§ 404.1520c(c)(4), 416.920c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* §§ 404.1520c(c)(5), 416.920c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative

medical findings in [each] case record." *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). "Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of [these sections], as appropriate." *Id.* The regulations reiterate that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of these sections) and consistency (paragraph (c)(2) of these sections) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).   As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally

persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3)

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* §§ 404.1520c(d), 416.920c(d). In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c or 416.920c. *Id.* §§ 404.1520b(c), 416.920b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

> (i)   Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii)   Statements about whether or not your impairment(s) meets or

medically equals any listing in the Listing of Impairments[];

(iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* §§ 404.1520b(c), 416.920b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* §§ 404.1504, 416.904.  Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.*  The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* §§ 404.1502(f), 416.902(f).  Signs are defined as

"one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* §§ 404.1502(g), 416.902(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*; §§ 404.1502(c), 416.902(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of

daily living and your ability to work[.]" *Id.* §§ 404.1529(a), 416.929(a).

But the SSA clarified that "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* §§ 404.1529(a), 416.929(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id*. The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA notes that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we

will carefully consider any other information you may submit about your symptoms." *Id.* §§ 404.1529(c)(3), 416.929(c).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.* "Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

> (v)   Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* §§ 404.1530(a), 416.930(a).   Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* §§ 404.1530(b), 416.930(a). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* §§ 404.1530(c), 416.930(c).

### G. Arguments and Analysis

#### 1. Listing 11.02(B)

Plaintiff argues first that while the ALJ provided sufficient reasons for finding that the condition of migraines did not meet Listing 11.02(B), he did not adequately support his finding that she did not medically equal the listing.  20 C.F.R. Part 404, Subpart P, App'x 1, §11.02(B).  (ECF No. 13, PageID.1391-95).  In turn, Defendant argues that the ALJ's finding that Plaintiff did not meet or medically equal Listing 11.02(B) was well articulated and supported by "the glaring omission of a detailed description of Plaintiff's migraines" in the medical records. (ECF No. 16, PageID.1414-17).

"At the third step of the administrative analysis, a claimant meeting or medically equaling the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. § 416.925(a)(4). "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.* (*quoting* 20 C.F.R. § 404.1525(a)). To establish disability at Step Three of the sequential analysis, the claimant must satisfy all of listing's criteria for a finding that s/he meets a listed impairment. *See Duncan v.*

*Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Houston v. Colvin*, 2017 WL 82976, at *2 (E.D. Mich. January 10, 2017) (Drain, J.) (same). The claimant bears the burden of establishing that he/she medically equals a listed impairment. *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987).

Primary headache disorder is not included in impairments listed in 20 C.F.R. Part 404, Subpt. P, App. 1. However, the SSA may find that the condition alone or in combination with another impairment(s), medically equals a listing. SSR 19-4p states in relevant part:

> If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential evaluation process, we assess the person's [RFC]. We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. . . . We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

SSR 19-4p, 2019 WL 4169635, at *7–8 (August 26, 2019).

The condition is analyzed under Listing 11.02B or 11.02D, the "most closely analogous listed impairment[s]." *Id.,* at *7. SSR 19-4p continues in relevant part:

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura,

29

duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* (citing 20 C.F.R. Part 404, Subpt. P, App. § 11.02 (Mar. 14, 2018)).[5]

At step two of the sequential analysis, the ALJ acknowledged that under SSR 19-4p, the condition of migraine headaches was a medically determinable impairment.   (ECF No. 10-2, PageID.70).   He revisited his discussion of the migraines at step three, providing the following rational for finding that the condition did not meet or medically equal Listing 11.02:

[T]he evidence does not provide a detailed description of typical migraine pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. (See D10F/33 where she reports migraine headaches occurring at most once weekly). Moreover, there is no concrete evidence of alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day. Further, the

---

[5] To *meet* Listing 11.02(B) (Epilepsy), the claimant must present evidence of "[d]yscognitive seizures . . . occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment . . ." *Id.*   Listing 11.00H1b defines dyscognitive seizures as the "alteration of consciousness without convulsions or loss of muscle control. *Id.*   The seizure activity may include "blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) . . ." *Id.*   Again, Plaintiff does not argue that she meets this Listing, only that migraine headaches medically equal the Listing by way of SSR 19-4p.

claimant was not referred to a neurologist for her migraine headaches until recently, in November 2020, and as of February 2021, the record supports she had not yet established such treatment.

(*Id*. at PageID.71).

Plaintiff points out that to equal Listing 11.02(B) the impairment must occur "at least once a week" rather than "more than" once a week as stated by the ALJ. (ECF No. 13, PageID.1392), (*See* fn 5). Apart from this misstatement, the ALJ noted that the record wholly unsupported a finding of equivalency. He observed that the record did not include "a detailed description of typical migraine pattern including all associated phenomena," or "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." (ECF No. 10-2, PageID.71).

The ALJ's misstatement of one of the criteria for an equivalency finding is of concern. However, he correctly found Plaintiff did not medically equal the Listing for multiple other reasons. Where the record does not support the finding that the claimant can meet all of the elements required for medically equaling a listed impairment, the failure to discuss equivalency under the listing, or even the listing itself, does not justify remand. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 415–16, 2020 WL 4559505, at *5 (6th Cir. 2020) (emphasis in original) ("Because the evidence did not show that O'Brien's medical findings are equivalent to *all* the criteria in [the listing] . . . the failure to have a medical consultant evaluate the

evidence was harmless. Substantial evidence supports the ALJ's conclusion that [the] impairments do not meet or exceed this Listing."). Again, where the evidence cannot support the conclusion that a claimant meets or medically a listed impairment, the failure to discuss the criteria for equivalency (or even the listing itself) does not provide grounds for remand. "[T]he ALJ did not specifically mention Listing 11.02(B), or any listing for that matter, but stated Plaintiff's impairments did not, individually or in combination, meet or medically equal one of the listed impairments. . . . [T]he ALJ's failure to explicitly evaluate whether the claimant was disabled under Listing 11.02(B) amounts to, at most, harmless error." *Lorraine Michele H. v. Comm'r of Soc. Sec.*, No. 521CV00013MADTWD, 2022 WL 7285345, at *7 (N.D.N.Y. Sept. 13, 2022), *report and recommendation adopted sub nom. Lorraine H. v. Comm'r of Soc. Sec.*, No. 521CV0013MADTWD, 2022 WL 4545541 (N.D.N.Y. Sept. 29, 2022).

Here, while the ALJ misstated of one of the criteria for equivalency, he noted that the evidence did not show that Plaintiff met the other requirements for equivalency under Listing 11.02(B). (ECF No. 10-2, PageID.71). Because correction of the ALJ's misstatement would not change the non-disability determination, a remand on this basis is not warranted. *See Harmon v. Saul*, No. 20-13132, 2022 WL 3975045, at *4 (E.D. Mich. Aug. 15, 2022), *report and recommendation adopted sub nom. Harmon v. Comm'r of Soc. Sec.*, No. 20-CV-

13132, 2022 WL 3974247 (E.D. Mich. Aug. 31, 2022) (citing *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 651 (6thCir. 2009)) ("typographical error" stating claimant could perform exertionally light work did not invalidate ultimate finding that she could perform sedentary work where VE testified that a significant number of sedentary positions existing in the national economy; "the ALJ's error is harmless because it did not prejudice Plaintiff.").

The ALJ did not err in noting that Plaintiff's claim of disabling migraines was also undermined by her failure to follow through on a referral to a neurologist. (ECF No. 8-2, PageID.71). The record shows that while Plaintiff received a referral as early as November 2020, she had not scheduled an appointment as of February 2021. (ECF No. 8-8, PageID.1300, 1372). *See Rodgers v. Comm'r of Soc. Sec.*, No. 13-CV-13746, 2014 WL 6612368, at *3 (E.D. Mich. Nov. 20, 2014) (Murphy, J.) ("[F]ailure to pursue recommended treatment" legitimate basis for rejecting the claimant's professed degree of limitation) (citing *Cruse v. Comm. of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)); *Echols v. Comm'r of Soc. Sec.*, No. 18-CV-12386, 2019 WL 3852528, at *6 (E.D. Mich. July 26, 2019), *report and recommendation adopted,* No. 18-CV-12386, 2019 WL 3842885 (E.D. Mich. Aug. 15, 2019) (Claimant's failure "to seek additional treatment to relieve the allegedly disabling pain caused by her headaches were logical and legitimate bases for consideration by

the ALJ in determining that her headaches were not as severe as alleged. There is no error here.").

Because the ALJ provided well-supported and well-articulated reasons for the conclusion that Plaintiff did not medically equal Listing 11.02(B), his findings should remain undisturbed.

### 2. Dr. Saperstein's Opinion

Plaintiff also faults the ALJ for finding Dr. Saperstein's January 2021 assessment unpersuasive, arguing that the ALJ improperly relied on GAFs reflecting only moderate psychological limitation and other "snippets" of the record that did not reflect her long-functional impairment. (ECF No. 13, PageID.1395-1400). The Defendant argues to the contrary that the ALJ's conclusions regarding Dr. Saperstein's assessment were both supported by the record and consistent with the record as a whole as required by 20 C.F.R. § 416.920c. (ECF No. 16, PageID.1421-27).

For claims made on or after March 27, 2017, the ALJ will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520c, 416.920c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources"). The factors to be considered in evaluating medical opinions

include supportability and consistency with the record as a whole; relationship with the claimant; length of the treatment relationship; frequency of examinations; purpose and extent of the treating relationship; whether the source has examined the claimant; specialization; and any other factors that support or undermine the medical opinion. §§ 404.1520c(c), 416.920c. ALJs must articulate the "most important factors of supportability and consistency" of the medical opinions but "are not required to [ ] explain" the consideration given to the remaining factors. §§ 404.1520c(b); 416.920c(b).

As discussed above, in January 2021, Dr. Saperstein found that Plaintiff was either "unable to meet competitive standards" required for fulltime work or had "no useful ability to function" in virtually all aspects of psychological functioning.[6] (*Id*. at PageID.1350-51). He found that she could be expected to miss more than four days of work each month. (*Id*. at PageID.1351).

The ALJ acknowledged that Dr. Saperstein was a treating therapist but nonetheless found his opinion "not . . . generally persuasive":

> Dr. Saperstein's assessment is not internally consistent, as his GAF scores of record [showing only moderate impairment] and finding that the claimant can manage her own finances are inconsistent his overall extreme limitations, which include essentially no ability to function in any area. Furthermore, his assessment is not fully consistent with the claimant's own mental status evaluations of record, which do reflect

---

[6] In just one category (being "aware of normal hazards") Dr. Saperstein found Plaintiff "seriously limited but not precluded" from work-related activity. (ECF No. 10-8, PageID.1350).

depression symptoms, but also show normal speech, good eye contact, logical and goal-directed thoughts, and good insight.

(ECF No. 8-2, PageID.79).

Substantial evidence supports the ALJ's rejection of Dr. Saperstein's finding of extreme limitation.  Plaintiff takes issue with the ALJ's citation to the GAF scores ranging between 51-57 (moderate social, school, or work limitation), arguing that a GAF score is not designed to assess long-term functioning but rather a "snapshot" of the individual's mental state at the time of the evaluation.  (ECF No. 13, PageID.1396).   Plaintiff is correct insofar as an individual GAF score does not reflect *ongoing* psychological limitations.  "The GAF exam 'is a scoring system that mental health professionals use to assess how well an individual is functioning in their daily lives.'" *Gray v. Comm'r of Soc. Sec.*, No. 20-10099, 2021 WL 298826, at *9 (E.D. Mich. Jan. 11, 2021), *report and recommendation adopted,* No. 20-10099, 2021 WL 289422 (E.D. Mich. Jan. 28, 2021) (quoting www.healthline.com/health/gaf-score).   "Moreover, the Commissioner 'has declined to endorse the GAF score for use' in assessing disability." *Id.* (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 F. Appx. 411, 415 (6th Cir. 2006)).

However, the ALJ did not cite the GAF of 52 assigned at the time of the assessment to establish that Plaintiff's limitations are merely "moderate." Rather, he noted that Dr. Saperstein's GAF was assigned at the same that he found that Plaintiff had "no useful ability to function," i.e. "extreme" limitation in the majority of work-

36

related areas.  (ECF No. 10-8, PageID.1350-51).  In other words, the GAF of 52 reflecting moderate psychological limitation undermined his accompanying finding of extreme limitation.  Further, although a GAF score is only a reflection of an individual's psychological functioning at the time of the assessment, the ALJ noted that Dr. Saperstein's treating records showed that Plaintiff's GAFs ranged between 51 and 57 over the course of treatment.  The ALJ reasonably concluded that Dr. Saperstein's *repeated* finding of no more than moderate psychological limitation contradicted his January 2021 opinion that Plaintiff's (presumably) long-term impairments were marked or extreme. (ECF No. 10-2, PageID.79).

The ALJ otherwise addressed the supportability of Dr. Saperstein's opinion and its consistency with the entire record as required by § 416.920c.  As to "supportability," the ALJ provided an adequate rationale for finding that the January 2021 opinion was unsupported by Dr. Saperstein's treating records and the record as a whole.  The ALJ further made a well-supported finding that Dr. Saperstein's disability assessment was not only inconsistent with other source observations but his own treating notes and other portions of the same assessment.  Aside from the non-examining evidence showing no more than moderate psychological limitation, numerous treating and consultative records show an unremarkable mental status. May 2019 records note that Plaintiff was fully oriented with normal concentration and mood; average intellectual functioning; and was able to "to engage in socially

37

acceptable interactions to establish and maintain relationships." (ECF No. 10-7, PageID.514-515, 706).    While Plaintiff self-reported via Patient Health Questionnaires ("PHQ-9") alleged symptoms of severe depression, treating sources noted normal speech and a euthymic mood.  (ECF No. 10-8, PageID1322).  January 2020 emergency room records (related to flank pain) note the absence of agitation or confusion. (*Id*. at PageID.793).  August 2020 consultative findings include normal memory, adequate contact with reality, and a normal thought process.   (*Id*. at PageID.737).  October 2020 records show intact judgment and insight with a normal mood and affect.   (*Id*. at PageID.754).

The ALJ did not err in finding that Dr. Saperstein's assessment was not only unsupported by his treating records but also internally inconsistent.  He permissibly concluded that Dr. Saperstein's opinion that Plaintiff could handle her own benefit funds (ECF No. 10-8, PageID.1351) contradicted his finding from the same assessment that she had no ability to function in the area of setting realistic goals and making independent plans.  (*Id*., PageID.1350-51).  *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 433–34 (6th Cir. 2018) (Opinion that claimant could handle benefit funds did not comport with accompanying finding that she "would have marked restrictions in making judgments on simple work-related decisions.") Likewise here, the ALJ reasonably concluded that Dr. Saperstein's finding that Plaintiff had the ability to handle her benefit funds stood at odds with his finding

that she was unable to meet competitive standards (for example) for even carrying out "very short and simple instructions."  (ECF No. 10-8, PageID.1350-51).  As such, the ALJ's analysis and rejection of Dr. Saperstein's assessment does not warrant a remand.

Because the ALJ's finding that Plaintiff was not disabled is supported by the record and adequately explained, the administrative determination should remain undisturbed.

## H.  Conclusion

For these reasons, I recommend **DENYING** Plaintiff's motion for summary judgment (ECF No. 13) and **GRANTING** the Commissioner's motion (ECF No. 16).

## III.  REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947

(6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 18, 2023                     s/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge